X. Rel. Aldridge. And we'll hear first from Mr. Bentley. Good morning, Your Honors, and may it please the Court. Michael Bentley on behalf of the defense. And as you're aware, this is consolidated on both the direct appeal and the injunction issue. Yes, Your Honor. Okay, thank you. Thank you. The materiality and center requirements of the False Claims Act are rigorous, and they must be strictly enforced to ensure that government contractors are not subjected to open-ended liability, to hold the line between punishing material fraud and policing commonplace regulatory noncompliance. That line was breached at multiple stages in this case. At every turn, in both the district court and in its arguments to this court, the government has pressed an expansive view of the False Claims Act that does not cohort with Universal Health v. Escobar or with this court's decisions. And it's not just the materiality and the center requirements that the government has stretched beyond reasonable limits. The government maintained an eight-year sealed investigation, during which it conducted one-sided discovery while keeping the defendants in the dark about the claims against them. And the reasons for that eight-year investigation are still secret from the defendants, the public, and from this court. And after conducting an eight-year investigation, the government abandoned the relators' claims, shrugged off the six-year statute of limitations under the False Claims Act, and asserted entirely new claims that the defendants had charged Medicare unreasonable salaries for 12 years, a question that falls squarely within the administrative process and that should be resolved by regulators in collaboration with the provider who submitted the claims. Worse, the salaries that the government claimed were false had been continuously submitted to the government, to Medicare, paid without objection or disallowance by the expert agency pursuant to its— Well, I don't know if paid without objection is the right way to characterize this case. I thought this was a pay-and-chase type case. It is a pay-and-chase case, Your Honor. Isn't that pay with reservation? It's pay with reservation, but it's also pay with suspicion that the certifications that are being submitted to the government are not accurate or, in fact, false. And so the government pays with the anticipation that there are overcharges, even false claims, in the process, and it has an entire administrative apparatus, the Medicare administrative contractor, whose job it is to audit, review, recover, settle claims that depend on the agency's test of reasonableness. Well, it sounds like you're really arguing about limitations and diligence, not materiality. Well, we're arguing that under Escobar and under this Court's decision in Harmon v. Trinity Industries, materiality looks at continuous payment and it looks at the likelihood that a— But neither Escobar nor Trinity dealt with a pay-and-chase situation, right? Those were pay-and-don't-chase situations. Well, they were continuous payment situations, Your Honor. They were government accepting that there was allegations of falsity, even knowing or suspecting that there may be fraud in the process but paying the claims anyway, always knowing— So you're saying that Escobar and Trinity involved pay-and-chase situations? No, not the particular pay-and-chase policy, Your Honor. But the pay-and-chase policy is similar, and let me see if I can walk through it. And the reason is under this very unique cost reporting and settlement process that is set up, as the government's own expert said, it's unique to critical access hospitals, this cost reimbursement. There's nothing like it left under the Medicare program. The government is continually—the provider is submitting claims on an annual basis that it says are reasonable. The government has a contractor, a Medicare administrative contractor, that is reviewing those claims for reasonableness, auditing them if necessary, and then settling the claims. So the government's not relying on certifications by the provider in this process. It's relying on its auditors. Well, but, you know, the Medicare program is huge, and the evidence was pretty substantial that your client had deliberately shifted overhead expenses from various of his other entities onto this—the pay-and-chase hospital. So it's hard for me to conceive how that shifting, if it's illegal, is not material. Well, Judge Jones, what I would say to that first is that the government's own experts are aligned in the view that nothing was hidden from the government. George Sciatta, and to your question about record sites, page 11, 270 to 272, is a critical exchange with the government's expert, where he says nothing was hidden from Medicare. I'm a MAC administrator. I can look at these reports and see the salary data for every single year. There's nothing concealed here. And any MAC administrator who has any experience should be able to find these salaries. That's the government's testimony. Well, that might go to the statute of limitations, as Judge Ho says. I don't see how it thwarts materiality. Because what it demonstrates is that the agency who was receiving and paying these claims had all of the data at all times that it needed to assess the reasonableness of these salaries. Well, but it didn't know that the defendants weren't showing up for work. I mean, there's evidence in the record that they did very little, if any, substantial work for SCH. And, Judge Wilson, I'm not here to fight that evidence, but I would say that even the jury did not accept the, quote, no work theory. If you look at the jury's verdict, they didn't zero out the defendants, which is what the government asked, and they didn't reduce Julie Cain's salary to the amount the government asked. Every year they awarded or they reduced Ted Cain's salary to $180,000 per year, which is what the government's experts said a full-time hospital administrator, CEO, would make. So clearly the jurors thought that Ted Cain and Julie Cain were providing some value to the hospital. The disagreement is about reasonableness, but a test of reasonableness does not produce true and false answers. It produces unreasonable or reasonable salaries. So a defendant who is submitting salary requests and asking for reimbursement under the Medicare regulations, again, for the government's own expert, disclosing everything the government needed to assess reasonableness, cannot later be said to have submitted objectively false claims simply because an auditor reviews the claims and says, you know what, your salary was unreasonable or even grossly unreasonable. That does not mean that the salary was objectively false. And so under the CENTER requirement, again, which Escobar said has to be strictly enforced, just like materiality, a provider who's submitting requests for salaries and indicating, certifying to the government that in their opinion these salaries are reasonable, should not be held to have submitted an objectively false claim just because the government later says that the salaries are unreasonable. And I think that's particularly true in this case where you're dealing with a statute, Code of Federal Regulations, Medicare guidance, the Provider Reimbursement Manual, which says a test of reasonableness looks at fair market value principles. It's a case-by-case basis, and it depends on the facts and circumstances of what the provider is doing in this particular case. So while the agency may, through that test, prefer to maintain some strategic ambiguity, to take a phrase from the Fourth Circuit's decision, that may be proper if you're reconciling salaries in the administrative process, but it's not a proper way to come back 12 years later and say your salaries weren't just unreasonable, they were objectively false, and we don't just want our money back. We want treble damages. We want a punitive remedy under the False Claims Act. This Court has never embraced that type of government enforcement of the False Claims Act, and it really is drifting into or crossing the line clearly into taking the False Claims Act and using it as a tool to enforce regulatory compliance, which Escobar, which this Court has said is not a proper use of the False Claims Act. Again, the government has other remedies, has a robust oversight and auditing remedy through the MAC, where it can, in real time, review these cost requests, make determinations about reasonableness. You know what? I mean, what you're saying suggests to me that rather than hiring 87,000 IRS agents, maybe the government should have hired 50,000 Medicare auditors because the Medicare, in our experience, seeing cases, the Medicare program is so vast with so many thousands of contractors that simply to say there is an audit mechanism available is far from enough to say that the government was on notice about what was happening here and that it wasn't false. Well, I guess I would have two responses to that if I can, Judge Jones. The first is that this process out of the entire Medicare universe is a unique cost-based reimbursement process where the MAC's job is to audit, review, settle with the provider in real time, make decisions about whether these cost reimbursements where you're saying this is the cost incurred, I think they're reasonable, what do you think, agency? Well, no. This is also designed to keep these facilities in small towns where there isn't much other care available, keep them going even though there may be discrepancies later on. And this wasn't just discrepancies. The jury did find $10 million even after deducting what they thought were reasonable salaries. So it's not a small potatoes accounting error. I agree, Your Honor. I'm not here to argue the reasonableness of the salaries, but I'm not here to concede that they're objectively false either under Medicare's tested reasons. But the second point I would say about the reimbursement process is if you look at the testimony of Sandra Rose, the government witness who is a MAC auditor, if you look at the testimony of William Tisdale, the government's expert on the MAC oversight process, they both said that in the vast majority of these type of cases, the recoupment occurs in the administrative process. So the process is working. It's a robust oversight process, and the government, again, is relying on its auditors, not cost certification statements about compliance with all rules and regulations and guidance of Medicare. The whole process is designed to pay despite belief that there's probably false claims and overcharges in the process. And to your question about jeopardizing health care, which is a theme that the government has pursued in this case, the regulations demonstrate that that's simply not a risk. The MAC has the ability to recover overpayments through an offset process, through a negotiated process with the provider where the MAC says, look, your salary was $500,000 too high. We're going to recover it over the course of 12 months, taking it out of payments to you. You're not arguing that the existence of this administrative process forecloses FCA claims, are you? No, I'm not. I'm not, Your Honor, because there could be objectively false claims even in this process. We're still just right back in the same materiality analysis. I agree. So, for example, if someone's charging for a fictitious person that doesn't even exist, that's a paradigmatic false claim. So that could still occur in this process. That is not the government's case. The government's case is when we take 12 years to audit you and look back, we can find salaries that we say are unreasonably high, and that is not the paradigmatic false claim act case, and it's not what Escobar and Harmon permitted. Well, if you'd even gone back six years, it would have been a paradigmatic false claim. Correct. So why don't you move on to – can you move on to statute? Absolutely. Absolutely, Your Honor. So the government is limited to a six-year recovery period, as Your Honor is indicating, unless it can demonstrate either that its complaint relates back to what the relator initially filed or that there's some basis for tolling that the government has acted diligently and should be permitted to stretch the statute back to 10 years. So to take both of those in turn, first, relation back. It's clear under this Court's precedent that the relation back analysis looks at the operative set of facts, not labels, not generic allegations of Medicare fraud, and that comes directly from the VAVRA decision, and the statute is to the same effect. It looks at transactions and occurrences, not labels. So here, as we've walked through in our brief, the relator, in May of 2007, files a complaint that makes factual allegations about ping-ponging patients, waiving co-pays and deductibles to increase the costs incurred by the hospital. Eight years later, the government, in its complaint, clears all of those allegations out and inserts its own allegations that for 12 years the defendants have been charging and receiving excessive salaries under the Medicare test of reasonableness. That allegation is nowhere to be found in the relator's complaint, and the government doesn't even argue that those facts can be found in the relator's complaint. The government says, well, the relator pled cost report fraud, so eight years later we can insert whatever our view of that statement is, regardless of whether it coincides with the actual facts pled by the relator. That type of relying on generic labels in a relator's complaint, first of all, runs afoul of the requirement that fraud claims be pled with specificity, which this Court has said over and over. If you're pleading a false claims act, it's the facts that matter, not the generic fraud allegations. Well, the district court applied VAFRA, or VAFRA, I guess, and said that it gave a broad meeting to 3731. In other words, as far as relation back, I guess the debate is the specificity of the allegations that are required. So how is the district court's reading of that opinion wrong? Well, the district court's reading of that opinion is wrong because it doesn't actually apply VAFRA, which says the question is whether the government's complaint and the relator's complaint share a core set of operative facts. And so while the district judge purported to apply VAFRA or cited VAFRA, he did not apply Rule 9b and look at the facts in the relator's complaint versus the facts in the government's complaint. He said cost report fraud is good enough. So if the relator says fraud, Medicare fraud, cost report fraud, it doesn't matter what the facts are. The government can come in again, in this case, 8 years later, and plead whatever facts it wants that fit under that vast umbrella of Medicare fraud. That is not how relation back works. And then to tolling. The government cannot claim tolling to extend the statute to 10 years, in this case, for a couple of reasons. First, the MAC, the agent charged to be on the front line reviewing these cost reports, making decisions about overcharges, has known all along, has had the information all along that it would need to assert the claims that the government ultimately asserted in 2015. The MAC has received the cost reports every single year. The cost reports revealed the salary data that the government's expert relied on. Pardon my ignorance. Help me to understand. They would have had all the information about what's being reimbursed. Obviously I get that because the government's cutting the checks. How would the government have been on notice that there was no value being provided under those payments? They were not working at all or working very little or whatnot. How is the government supposed to know that? The government is not supposed to know that at the outset, Your Honor, but certainly has the means to find that out. So that goes to the question of diligence. You're making a reasonable diligence argument. Correct. So the MAC, even if the MAC doesn't know. It sort of goes to Judge Jones's point of how do we apply reasonable diligence to such a massive federal program. Yes, and I think the way you apply it is you look, in this case, again, unique circumstances of the critical access reimbursement where the MAC is the front line. As Sandra Rose, the auditor they called, testified, it was her job, she said, to protect Medicare's money. Now, she says she just missed these claims, but she agreed on cross-examination looking through the cost reports that the salaries were, quote, plainly disclosed. So it does go to diligence. And the salaries are disclosed, but how do you know that the salaries are wrong? Well, that's your question, Your Honor, and so the way you do that is if you have any question about the salaries, you ask for more information, you ask for more details. The MAC oversight process permits the auditor, the MAC, doesn't just have to take the cost reports at face value. In fact, the government did a desk audit, in this case, looking specifically at increased costs and salaries. So there's evidence in this case that it does that, but it does that on a regular basis. So you get the reports. You can dig in. You can request more information. You can have discussions in real time with the provider. Ask, what's the basis for these salaries that we think are patently high? And the government never did that, although it could have for the entire 12-year period that the Department of Justice claims. Yes, Your Honor. Their tolling argument implies that there's virtually no statute of limitations. Correct. That's exactly right. Number one. Number two, I'm wondering, did Mr. Aldridge testify? He did testify, didn't he? He did not testify, Your Honor. So we don't really know what was in his mind when he filed the original complaint. That's correct. Okay, because I think I have a quote here. I think it was fairly vaguely worded about, well, maybe not that vague, but oh, well, I had it somewhere. All right. I won't bother you anymore. Well, yes, Mr. Aldridge did not testify at trial, so he did not explain at all what his allegations meant. And in any event— What—these confidential memoranda that the government relied on to get extensions for eight years. Yes. To what extent—I mean, obviously you haven't seen them, is my understanding. And so to what extent do those memoranda flow into this idea that there shouldn't have been tolling? They absolutely flow, Your Honor. And, again, we haven't seen them. We haven't been permitted to see them. Only the district judge, Judge Wingate, has seen them. But there could be—again, if the government is pursuing an investigation and providing, quote, a convincing rationale for its good cause extensions, which is required, it's a substantive standard, then it's got to be telling Judge Wingate, here's what we're doing, here's where we're hitting roadblocks, here's what else we need to fully understand our claims. Do we unseal those and ask for supplemental briefing? What's the remedy? I think that is a remedy. We've suggested that in our principal brief, that this court could unseal those, even unseal them attorney's eyes only, and let the attorneys make arguments based on what is in those sealed memoranda. It could— I'm thinking the idea is you unseal these various memoranda where the government explains why it needs more time, and you hope to find out or prove up your statute of limitations defense. That, okay, see, you're admitting, if they did, that they knew about the salaries, or they're not admitting, in which case your claim loses. Correct. Or they're demonstrating there's no diligence on the government's part at all. So for three years before they ever even notify us of an investigation, we may find pro forma filings that just say we're overworked, we're busy, our resources are stretched. That's not sufficient to get a good cause extension. So again, we don't know— Oh, I see. Because that wouldn't help you on your defense, but your point would be then what? They don't get the extension, but they already got it. Well— Are you just going to throw out the whole case? No. Our position would be that would—I'm talking back to the tolling point. If that's what's in the documents, it would not support a reasonably diligent investigation. So you— Oh, I see what you're saying. You haven't done anything. We're just busy, and you would submit that that's lack of diligence. And the cases say that. So you've got this MAC process that you say should have discovered this well before any tolling. You've got possibly what's in the memoranda, the confidential memoranda asking for extensions to show lack of diligence. What other evidence do you have that the government should have known about its claims before, what, 2012? So two pieces of evidence, Judge Wilson. First is the relator's own expert, Rob Church. I have two points about Mr. Church. But the first is Rob Church's investigation demonstrates diligence. So he started in October of 2009, according to his timesheets that he's filed in the court. And by February of 2011, no later than November of 2011, according to his timesheets in his affidavit, he had identified the excessive salary claims that the government later asserted. So it took him two years of reviewing cost reports to come to the conclusion that the government took eight years to come to. So there's evidence. Doesn't he say at some point that he shared it with the government? Yes. Yes, Judge Wilson. Did he say that he didn't really do that? Yeah. So my second point, Your Honor, is you've got encapsulated in Church what a diligent investigation is. But you've also got the added point that he told the government as early as February 2011, hey, look at these cost reports and these excessive salaries that are being charged. Now, the government, Tom Morris, the Department of Justice attorney who tried the case, said I didn't know this until December 2013 when my expert told me. Well, there's evidence in the record that calls that into serious doubt, and at the very least that has to be discovered. One way to do it is through unsealing the sealed memorandum and see what the government is telling the district court about why they're taking eight years to investigate the claims that were later discovered in two years according to his timesheets. Before you run out of time, we'll shift real quick to these eight years' worth or 18 extensions. And your argument is that it shouldn't have been done way too long. There's case law that indicates that may be well meritorious. What about the remedy? You say the whole case ought to be dismissed or the government's case ought to be dismissed. Tell me about that or tell us about that and your support for that remedy. So there's no circuit court precedent on this point. No case of this extreme delay has gotten to a circuit court. District judges always cut the government off at four years, 18 months, five years. So we think the only remedy, if there is a violation of the substantive good cause standard, there has to be a remedy. The only remedy that we see in the statute and that we see in typical judicial processes is to dismiss the government's False Claims Act complaint. It never should have been permitted to go on this long. They've abused the good cause standard. You'll acknowledge that's a pretty extreme remedy. I mean, if a district court is just really dilatory, somebody asks for a thousand briefing extensions, that's terrible. I agree with you that it's terrible, but maybe it is a violation or an abuse without a remedy because it seems like the remedy of throwing out the entire case due to too many extensions is pretty dramatic and disproportionate, isn't it? Your Honor, it is extreme. I recognize that. The circumstances here are extreme. And we also have the government as a litigant. The government is held to a high standard when it comes into a federal court and litigates these claims. So I don't think it's too extreme. I definitely acknowledge your point that it is an extreme remedy. And we're not saying you dismiss the entire case. The relator's claims remain. It's the government who breached the good cause standard and the government whose complaint should be dismissed.  Okay, thank you. I didn't address the injunction. All right. We'll take it on the briefs. Ms. England? England? May it please the Court. Good morning, Your Honors. I'm Angela Williams on behalf of the United States. And I, along with L. Speth England, will be arguing this case. Oh, I'm sorry. I'm Williams.  I didn't realize there were two of you. Sorry about that. No problem, Your Honor. I will be handling the issues on the direct appeal, and Ms. England will be handling the issues on the judgment enforcement injunction. This case resulted from a nine-week trial with over 25 witnesses, hundreds of exhibits, after a lengthy investigation where a jury, following the instructions agreed to by all parties, found Ted Cain, Julie Cain, Tommy Calouse, CMI, and Stone County Hospital liable for more than $10 million worth of fraud. This is not, as Mr. Bentley suggests, a simple case of noncompliance. In this case, there were years where Ted Cain and the other defendants billed Medicare for upwards of $2.7 million in compensation for a critical access rural hospital in Stone County, Mississippi, a hospital that generally had a census of around six to ten patients, a hospital that also had not just an administrative officer but also a COO, director of nursing, and various other individuals that actually ran the hospital. Each year, Ted Cain and these other defendants changed his salary from year to year, billing it to Medicare through Stone County Hospital. It is important to note in this case that the cost reports that were submitted to Medicare, that there were two every year. There was a Stone County Hospital cost report for the critical access hospital, and then there was a separate cost report submitted separately for CMI. Ted Cain's salary was nowhere to be found on the Stone County Hospital cost report. If the Stone County Hospital cost report was audited, no one would know that the general and administrative fees charged by CMI were in fact largely Ted Cain's salary. The CMI cost report does disclose the salary, but again, they're submitted separately, and there might not be an audit of both. In fact, in the instance of Sandra Rose, when she did the limited desk review, which is very different than an audit, that year that she did it, she did not know that CMI was connected to Stone County Hospital, number one. There's nothing on the CMI home office cost statement which says that. And she also did not know that Stone County Hospital was a critical access hospital reimbursed at 101%. It is important for the court to know that CMI can pay Ted Cain whatever it wants to pay Ted Cain. It is what CMI decided to bill to Medicare and to seek reimbursement for, and that is not apparent from the CMI home office cost statement. But couldn't they see the management fees? I mean, were the CMI fees themselves enough to trigger at least some responsibility to question? No, Your Honor, because the CMI fees are in a general line that just says administrative and general costs. There were a number of individuals working for CMI. The MAC, if they were to look at it, wouldn't know how many people were working for CMI. In fact, when Sandra Rose did that limited desk review, asking for why there was such a discrepancy or increase in the salaries, the response she got back from CMI wasn't that Ted Cain's salary went up by $800,000 in just one year. It was that we took on some new facilities, and the line that she was investigating or that she was looking at was a line that said salaries of officers, plural, not singular, even though that line was solely for Ted Cain's salary. Let me ask you a question. Mr. Cain had a number of Medicare and Medicaid facilities, right? He did have a number of Medicare and Medicaid facilities. He only had one Medicare facility that was reimbursed at 101%. Oh, I understand that. I understand that. But what I don't understand is how the auditors would not correlate the fees of the management company against each one of those facilities. In other words, if he placed all the excessive fees over on SCH, then he was necessarily charging lower fees on the other facilities, right, or not? There were two different methods of allocation that they used. There was both pooled and direct allocation. And so if they had used pooled allocation, then the salary would have been distributed based on the revenues of each of the entities. But because they used direct allocation, and Stone County Hospital was the only one for which they used direct allocation for Ted Cain's salary, there's no way to really – they're saying that he worked directly for that entity, which is not the case. For direct allocation, you were supposed to have documentation of actual hours worked in that facility. All the experts testified that you couldn't rely on estimates, whereas Tommy Caloos indicated that that's all he relied on, and even those were unreasonable, the estimates of the purported hours that were worked for Ted Cain. So in this particular instance, there was ample evidence that – I'm sorry, that Ted Cain did little or no work that was reimbursable for that particular – Well, he showed up for the fried chicken and fried fish. He did show up for the fried chicken and the fried fish, but thankfully Medicare does not allow reimbursement for that activity. On the issue of materiality, the pay and chase, the court hit on a point that is very important and that was recognized in Mesquia's. Medicare is a vast system. There are thousands upon thousands upon thousands, hundreds of thousands, millions even, of claims submitted to Medicare on an annual basis. In this case, not only did you have – you had two separate cost reports, so it was even more complicated than that. And the government cannot be expected to go through and check every single cost report that is submitted to it. Is that a call for Congress? I mean, I guess what I'm thinking is, you know, the FCA sets up limitations, and they're, as far as I know, categorical limitations. It doesn't matter what program, doesn't matter how big or small, how easy it is. It seems to me that if the executive branch thinks for Medicaid – I'm sorry, for Medicare, three years is not enough, you know, that these timeframes are not enough, you can get a longer statute of limitations. But until that such time as Congress does that, it doesn't really matter how hard this is for the government. The time is the time. What's your response to that? On the issue of the statute of limitations, there are a couple of points. Congress – there's nowhere in the FCA where Congress says that the remedy for extensions of seals, which Congress recognized without limitation – it didn't say you only get to investigate for a certain number of years. It says that for good cause, you can go to the court and seek extensions of the seal. Congress didn't put a limit on that. And nowhere in the congressional statute does Congress say that if you get too many seals by somebody's judgment, that you can dismiss not just a case, but a case that went to a jury trial and resulted in a verdict in five years. I understand all that. I think I'm talking about limitations, though. At the end of the day, what's the rule that it's six years to file the claim? Yes. And then you get this three-year due diligence thing, but even that's capped at ten. Ten years. I have it slightly off. It's fine. But, like, you get the idea, obviously. Yes. Yes. Why isn't the rule the rule, regardless of how hard it is? Let me put it this way. I grant that it's probably, you know, very taxing for the executive branch to figure out how to get rid of all this Medicare waste and fraud. It seems like that's a good argument for Congress to give you more time, but that's not what we can do. Yes. You're correct that Congress has said what the statute of limitations is, and that is at maximum ten years. But it's important to note here that the claims in this case fall well within that. Not only does the relation back principle apply, because the claims do come from the same . . . May I interrupt you, I guess? No, I think you're going to go. Well, so let's talk about relation back. Counsel opposite says the district court misapplied the Vobrer case, and certainly Vobrer says to relate back a claim still has to be tied to a common core of operative facts. So discuss a little bit how general that can be versus how specific it needs to be, and are the government's allegations specific enough to relate back here to what the relator pled, I guess, in 09 or 07? Yes, they are specific enough, Your Honor, and they are specific enough because the relator, both in the amended complaint and certainly by the time of its . . . I'm sorry, in the original complaint and certainly by the time of its amended complaint at ROA 116, said that SCH's cost reports, and this is a cost reporting case that the government brought, contained unallowable costs and false certifications of compliance with the rules and regulations of . . . But did the relator allege excessive salaries on the part of the Keynes? The relator's complaint doesn't specifically go to excessive salaries, but the statute doesn't . . . But doesn't it need to for the government to benefit from a relation back? No, it doesn't because the . . . What's your best case? The best case is Vobrer and the statute itself. The statute itself says that the government can add claims, that the government can add additional facts. It doesn't limit the government as long as the statute says, as long as the claims arise out of the same conduct, transactions, or occurrences. The cost reports that were at issue here are the same conduct, transactions, or occurrences. It's the same . . . What makes that the right . . . This is about the level of generality, right? We're trying to figure out what's the proper level of generality to understand how the relating back doctrine works. It seems to me the other side has at least a reasonable argument that to say it's the entire cost report, and that's a pretty high level of generality, isn't it? No, Your Honor, because we're not just saying the cost report was fraudulent. We're saying that there are unallowable costs that they did not comply with the certifications, which they knew . . . Is that tantamount to saying we're suing the same defendant over the same hospital, and therefore it's all covered? No. Okay. I assume you would resist that clarification. Yes. That would seem crazy. Tell me why this is not that crazy. Because in this case, you're dealing with the false certifications that were made, that the costs that were submitted were in fact compliant with Medicare's instructions, with the rules and regulations regarding reimbursement. That doesn't seem that much an error. Now what you're saying is it's not just the same defendant in the same hospital. It's also the same federal program. Okay, but that's your theory, that relating back applies so long as it's the same defendant, same entity, and same massive federal program? Everything is covered at that point under relating back? It's more than that. It is, in fact, that you're dealing with the certification, that you're dealing with the unallowable costs. What does Medicare reimburse that is not reimbursed according to a certification? You don't get any? I mean, maybe if you're a patient, you . . . I don't know whether patients get reimbursed, providers get reimbursed, and they all have to do certifications. That is correct. There are certifications, but we believe that that is sufficient in this case to have relation back, and the Bobber case supports that. Well, now you say that the relator here was alleging some kind of false cost reports, but apparently he alleged some pretty specific errors like inflated supplies, ping-ponging patients between nursing homes, improperly waiving co-pays and deductibles. The government didn't go to trial. Did the government go to trial on any single specific allegation that he raised? I believe that the issue related to the BMW may have been factually similar to some of the issues raised in the complaint. Also, there were issues related to related entities in the complaint, and we went to trial and recovered on charges that were related to related entities, that they charged Medicare but didn't charge Medicaid, the distinctions there. And, Your Honor, I would note that in the Bobber case, the government in that case did not go to dismiss or every claim of the relator was dismissed in that case. In that case, the government added an AKA claim, and they went forth on that claim only. So this is very similar to the case that we have here. And I would also note that even if relation back doesn't apply, the 10-year statute of limitations does apply. Let's talk about that. That was the next thing I was going to raise is this tolling. You heard counsel opposite talk about, number one, the MAC process, the desk audit, all those things should have caught this or at least put the government on notice. Then there is this issue of these confidential memoranda by which you got an extension of time, which leave the extension period to the side for the moment. Let's just focus on the memoranda, which are sealed. You have them. They don't. And then there is the evidence of the relator's expert who says, well, I told the government in 2011 about the excessive salaries, et cetera. So how is it that the government exercised diligence and could not have known the basis of its claims whenever in 2012, three years before the complaint was actually filed? Your Honor, I will address each of those in turn. First, with respect to the MAC. The statute is clear, and the court's case in, I believe, Kellogg-Brown, if I'm not mistaken. Yes, U.S. v. Kellogg-Brown specifically says that the official responsible, the knowledge is for the attorney general, not the MAC, not the fiscal intermediary. So the attorney general has to know the basis for the claims, even if some other branch of the government designed or actually charged with effectuating the statute or administering it knows until the cows come home? If Merrick Garland doesn't know the basis of the claims, the government gets to just continue on? Your Honor, government negligence is not a defense. Also, the only entity . . . It's probably a good thing for the government, perhaps, not in this case, but in general. But still, it seems implausible to me that the attorney general, him or herself, has to know the basis for the claims. Your Honor, it's not implausible because the attorney general is the only one who can bring the claim. Well, the attorney general or his . . . Or his designee, yes. Does DOJ have some specific paper or communication from the attorney general authorizing this case? No. It probably had sign-off from the Civil Division of the Justice Department, but the AG doesn't personally sign-off. Yes. Yes, Your Honor, you're right. The designee is the attorney general or his designee, so the Court is correct about that. But in this case, though, it still remains that it's the Department of Justice and that the MAC is not . . . Okay. So that takes care of the MAC. Yes. But now you've got these memoranda that were authored by government attorneys within the DOJ, correct? Yes. Your Honor, the . . . Should we unseal them and ask for supplemental briefing from the parties? No. No, Your Honor, you should . . . Why not? You should not unseal them because the seals are there for a reason. It allows the government . . . Post-trial. I'm sorry? Post-trial. I mean, is there any reason to continue sealing the information? Your Honor, the reason would be that the government is obligated to share with the Court and does so in the confidence that the memoranda are sealed. We're the Court. Issues . . . I don't see why that makes a bit of difference. We're the Court. We look at sealed documents all the time. Yes, and if Your Honors wanted to review those documents . . . That's what I'm suggesting. Yes, and if Your Honors wanted to do that under seal, I believe that that might be appropriate. But unsealing them is a very different thing where you're providing them to folks outside of the Court. So, just to be clear, if they're sealed and we review them and we determine that there's bases in these memoranda that the government should have known about its claims before 2012, you're not going to come back and object as the government that, oh, my goodness, well, you know, we weren't given a chance to be heard on that. We would prefer a chance to be heard if the Court believes that it should be . . . How do we do that without engaging the other parties? An in-camera briefing before the Court on the issue of whether the seal should be lifted in the first instance would be the appropriate thing to do. Well, I'm assuming you would agree that the other party gets to look as well. It obviously could be in a sealed environment, but I take it their whole theory is there could be information there relevant to their limitations defense. Okay. I think I may have missed the Court's question a little bit. The issue that I was saying we would want to have briefing on is whether the Court is going to unseal the documents in the first instance and show them to another party. That would be the issue that we believe that there should be some briefing on. If the Court determines that there should be supplemental briefing on some other issue, then obviously . . . I don't see the need for briefing on whether to . . . I mean, I do think we need to look at them, and if we determine that we need briefing from the parties, we can determine we need briefing from the parties. Your Honor, I . . . Okay. I accept that Your Honor's . . . Well, I mean, quite often we get this on appeal all the time. One party says we need to look at sealed records so we can write our brief. We grant those motions routinely in criminal cases. I really don't see what the big fight would be here against allowing counsel to look at those memoranda for purposes of civil defense. Your Honor, two points, if I may. I know my time has expired on that issue. The first point is that in these briefs, the government is discussing investigative techniques, efforts in their investigation, which are privileged. In addition, Your Honor, in this case, the court doesn't have to go to those briefs, because the defendants had knowledge of the government's investigation and the scope of the investigation as early as 2010. And there was diligence in this case, because from 2011 on, the government spent most of its time fighting the defendants in court, so much so that the district court had to issue a contempt order. The defendants even appealed orders to this court during that process. So it wasn't as if there's— If the other side had notice of the government's investigation and impliedly, I guess, the eventual claims that came out of it, how in the world could the government not have known in 2010 what the basis of its claims was? There's a difference between knowing that there might be an issue and knowing that you have a claim. The government has to satisfy itself that certain elements of a claim are met before it can bring a claim. It has to satisfy itself with respect to Rule 11. So investigating— I mean, the government could have prevented a whole lot of problems if, when it discovered there was an issue, it had said, go back to the auditors and ask them to audit, and therefore maybe Aldridge would have changed his ways and we wouldn't even be here. Your Honor, an audit does not satisfy this case. This was a case— I understand that, but what you're suggesting is that you were looking at making a case from that period and you were just looking, well, we need to do more discovery to support our case, which means you thought you had a case. Alternatively, I was not trying to be pugnacious about that. My point was that if you just had the issue and you think there's an issue and Medicare is being way overcharged, then you go back to them and say, you better stop this, and they wouldn't have collected several million dollars until you finally got your ducks in a row. You see what I'm saying? I do understand Your Honor's point. However, there is a clear delineation between the administrative and the enforcement parts of the government, and the government generally tries to keep those separate for various reasons. Also, I would note that the statute, the forms that the parties signed all indicated that there are administrative, civil, and criminal remedies available to the government in that case. I see my time has expired. I appreciate Your Honor's time. Thank you very much. Now Ms. Englund. May it please the Court. My name is Elizabeth Englund, and I represent the appellee, the United States of America, in Appeal 22-601-65, and that is the appeal from Judge Wingate's March 14, 2022, enforcement order. I was just going to ask, hoping against hope, that he might have entered an order following that. I didn't check this morning, but he has not yet. But I do think that this Court should look to him. There will be another appeal as soon as that order is entered, right? Well, I think that Judge Wingate has an opportunity in writing the opinion to be able to say that he's looked at the judgment injunction and the transcripts from the trial, and that that was the permanent injunction, and his order of March 14, 2022 was merely an injunction enforcing the existing judgment injunction. And in fact, on June 4 of 2020, in their motion to alter or amend the judgment to remove the offending language that governed non-parties, defense counsel stated this document, and they're referring to the judgment, continued your Honor's pre-judgment injunction apparently forever, and it continued it past the date of the final judgment, and that's at 144-62, and that is well within the time period for them to be able to have appealed the final judgment because it was an injunction binding non-parties, but it binds them through Ted King because as Rule 65 states, agents of the bound and those who are also in active concert with them are also bound. And this Court said the same thing in Tease v. 20th Century Fox, and as your Honor well knows, and Thomas v. Hughes, that a party cannot do through an entity they control that which they are bound, and the record supports all throughout trial that Ted King and Julie King, but mainly Ted King, exclusively controls all of these entities, and that is why Judge Wingate issued the enforcement order. It does not qualify as one granting, continuing, or modifying an injunction under 1292-A1 as this Court held and in Ray Seabolk in a complaint of Ingram towing. And just like in complaint of Ingram towing, this Court found that the first two orders were injunctions and appealable, but it did not have jurisdiction because they were untimely. And this Court dismissed the third complaint because it was merely interpreting and enforcing the existing order. In fact, Judge Wingate specifically states that it is enforcing his May 10th judgment, and it was, quote-unquote, not a new injunction. And he issued an order denying defendants' motion to say the injunction. He explained that it existed in the judgment itself. In fact, Judge Wingate also stated as part of his order for the injunction that this Court has issued several orders over the course of this trial telling defendants not to dissipate assets. It included the same prohibition in the final judgment, and that's at 84-11. This remedy we're traveling under, this oral asset freeze order that started on January 28, 2020, is one that defendants volunteered at trial. The United States moved to attach properties, which defendants now call nonparties, and to garnish a payment to what they would now call a nonparty. And then defendants volunteered at 5033 in their response to our motion to have this asset freeze. At no point in time did they suggest that Judge Wingate did not have jurisdiction over these nonparties. And in fact, the United States and the Court stated that they were concerned that the owners of the 99 percent would do something with the assets and the Court would lack power over them. And in response to that, defendants stated that they would prove to the Court that it had jurisdiction over those entities. And they provided documents doing the same, and that's at 121-62 to 69, 121-85 to 88. And defense counsel stated on the record he had examined all of the documents of those entities and was satisfied that Ted Cain controlled them and also that the Court had power over Ted Cain. And the specific property at issue, 400 North Beach Boulevard, had been under this Court since January 26, 2020. They asked the Court to issue this asset freeze order to avoid prejudgment writs of attachment. They certified after the jury came back that they would follow them, and it touched all of the nonparty entities. And then after the Court issued its judgment, they asked the Court to alter and amend it, and the Court declined to do so. They failed to appeal both on the merits appeal, and they also failed to appeal under 1292-A1. The only thing the defendants have here is the allegation that the scope has changed. But as this Court has stated, a mere allegation will not suffice to grant this Court with jurisdiction. And the record shows that the defendants have stated well beyond the date of the judgment injunction that it bound all of these nonparties. That's included in an April 2021 filing by defendants at 7582, and it's also stated multiple times at that July 21, 2021 hearing, excuse me, where they stated that the listing of 400 North Beach Boulevard would not violate the Court's injunction, but sale would. They told Judge Wingate, this doesn't violate your existing injunction that we're well aware of. Only sale would do it. We have listed it. The government, in taking this position, has probably disabled a sale at what may have been the apex of the market. And why couldn't some agreement have been reached to let the sale go forward and hold the proceeds in escrow? I'm just wondering. Well, first, we were never approached about a sale to do exactly that. But you knew a sale was the reason you triggered this hearing in the district court was so you found out about a sale. By happenstance, even though they told Judge Wingate. I don't care. My point is. It is entirely plausible. They could have come to Judge Wingate and said, we want to sell 400 North Beach Boulevard. We think it's great for everyone. We're going to sell it, and we're going to put it in the Court's trust. That's what the government could have said. The government could have just taken the initiative to do this. That's all I'm saying. Well, at the point in time when we found out that a sale was pending, for the first time ever, they stated that they were shocked to find out that Judge Wingate's judgment injunction bounds non-parties. We heard these non-parties, there's no jurisdiction for the first time ever, which betrayed their prior representations. But certainly, they could have come to the Court and said, here's this amazing market. Let's sell it. Let's put it in the Court proceeds, and then when we find out what the Fifth Circuit is going to do on our judgment, then we'll distribute it accordingly. But they did not do that. They said, how dare you. These are non-parties. And if they came to just the United States, I'm not sure that we would have taken Ted Cain's word that this was an arms-length transaction that was the best for everyone involved. Well, the fact is you don't know anything about the transaction, right? We only know what they submitted in a real estate, a realtor's affidavit, who has her commission at issue and obviously wants some amount of money. But there was no discussion at the hearing as to whether or not some sort of intermediate remedy was available, because they stated at that point there was no jurisdiction over that specific property. And as to the due process points that defendants raised, again, this was a court enforcing its order. It did not need to ask the parties to file motions in order to have authority to enforce its own judgment and order. And even if notice was necessary, Parker v. Ryan says that actual notice will suffice, and they've known since the United States' June 23rd email of 2021 that we believe that sale of 400 North Beach Boulevard violated the injunction, and they knew since the July 2021 hearing. So they had months to consider what was going to happen if their client ended up selling that. And, again, all of these entities they call non-parties, Ted Cain operates through filings that he's put with the Secretary of State. So there was actual notice that this injunction bound them. And if this court finds jurisdiction, we believe it should defer to the district court in upholding its own judgment and order. We cited the cases of Francois Piney Woods and in Ray Hornbeck Offshore Services, because it stated it is well established that a district court is entitled to a degree of flexibility in vindicating its authority. We ask that this court find there is no jurisdiction and dismiss the injunction, or otherwise uphold it as a valid exercise of the district court's power. Thank you. Thank you. Mr. Bentley, rebuttal. Thank you, Your Honor. I want to start, if I can, with the notion of concealment that the government has pressed throughout this case and that simply is not supported by the record, and I want to give the court record cites to show that. First, our brief, the Appellant's Principal Brief at 9 through 12, cites one of these cost reports, the 2007 Home Office Cost Statement that was discussed extensively at trial and in the briefs. You can look at the first page of that report. It shows you the total administrative costs incurred, sent to Stone County Hospital. You can look at page 38, which is Schedule B, which shows you the total amount attributable to the salaries of officers, and then you can look at page 46, which is Schedule G, which shows the direct allocation to Ted Cain. But you don't have to take my word for it, because all three of the government experts with knowledge of this testified that the salaries were plainly disclosed, and I want to give you those record cites because I think they're important. Sandra Rose, the MAC auditor who actually audited this hospital, record 9661 through 65, she testifies that when she looks at the cost reports at trial, the salaries were, quote, plainly disclosed. William Tisdale, the government's expert on the cost reporting process, record 884 through 87, he said it was apparent from the Home Office Cost Statement what the salaries were. George Sciatta, the government's expert on damages, record 11270 through 72, agreed that the defendants, quote, didn't hide anything, didn't attempt to conceal anything from the government, and George Sciatta said he agreed the debate here is about the reasonableness of salaries, not concealment from the government. Turning to the materiality point, the government's argument, as I take it, is that Medicare is such a vast, expansive thicket of regulations that they have to use the False Claims Act to enforce it when 12 years later, they find out that salaries submitted that were certified to be reasonable were, in fact, not reasonable. That is not the purpose of the False Claims Act. The remedy there is the remedy that's always there, which is the Medicare oversight process, the MAC, audit, settlement, recoupment through the administrative process. And the case I would point this court to, and it's discussed in the briefs, is Janssen v. Lawrence Memorial Hospital, the Tenth Circuit decision that's very similar to this, where it's a Medicare reimbursement request that the Tenth Circuit said the evidence here raises an inference of falsity. But this type of falsity, violation of regs, is dealt with in the administrative process. The government has a remedy. It is not the False Claims Act, and the remedy is not to subject people who are attempting to comply with this vast thicket of regulations to travel damages. The remedy is to get the government's money back. No one disputes that that remedy is available. Turning to the statute of limitations, I want to talk briefly about the relation back. It's pretty clear if you look at these complaints. We've been discussing it this morning. There are factual allegations made by the relator. The relator thought the facts were important. The government scrapped those allegations and replaced them with its own allegations eight years later of unreasonable salaries and expensing a luxury vehicle to the government. The relator's complaint said nothing about any of that. You want to take this opportunity to distinguish Vavra? Yes. I think, Your Honor, Vavra, the important takeaway from Vavra is that the government, I mean, the court is looking at the statute, reading the term transactions, occurrences, and events, and saying that is effectively a Rule 15c relation back analysis, operative core of common facts. So Vavra is saying you can't show up government eight years later. Now, you can plead your claims. You can add new claims, and you're subject to a six-year statute of limitations. But you can't show up eight years later and say we get to look back for 12 years under relation back theory that has no attachment at all to the facts in the two complaints. As to tolling, the statutory language makes clear that the officer charged with responsibility to act in these circumstances, it's a circumstantial test. So the question is government knowledge, and in the circumstances, the most likely officer to be referred to under that language is the MAC, the agent whose duty it is, as Sandra Rose said, to protect Medicare's money. They're the agent charged with responsibility to act. And the plain meaning of act does not mean file suit. It means, quote, do something. So the MAC auditor is the proper agent under that statute. But even if you're looking at someone in DOJ and the Civil Division, as we discussed, there is ample evidence that the government knew or should have known with reasonable diligence of these complaints, these claims they've asserted well before the three-year cutoff period. Thank you. Thank you, Your Honors. All right. Thank you very much.